UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN TRENT ADAMS,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN CHAPPELL,<br><br>Defendant. | No. 2: 20-cv-00844 KJN P<br><br>ORDER AND FINDINGS AND RECOMMENDATIONS |

I.  Introduction

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court is defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 18.)  For the reasons stated herein, the undersigned recommends that defendant's motion to dismiss be granted.

II.  Legal Standard for 12(b)(6) Motion

A complaint may be dismissed for "failure to state a claim upon which relief may be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss for failure to state a claim, a plaintiff must allege "enough facts to state a claim for relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(citing Twombly, 550 U.S. at 556).  The plausibility standard is not akin to a "probability requirement," but it requires more than a sheer possibility that a defendant has acted unlawfully. Iqbal, 556 U.S. at 678.

Dismissal under Rule 12(b)(6) may be based on either:  (1) lack of a cognizable legal theory, or (2) insufficient facts under a cognizable legal theory.  Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946, 956 (9th Cir. 2013).  Dismissal also is appropriate if the complaint alleges a fact that necessarily defeats the claim.  Franklin v. Murphy, 745 F.2d 1221, 1228-1229 (9th Cir. 1984).

Pro se pleadings are held to a less-stringent standard than those drafted by lawyers. Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam).  However, the court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.  See Ileto v. Glock Inc., 349 F.3d 1191, 1200 (9th Cir. 2003) (citing Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981)).

In ruling on a motion to dismiss filed pursuant to Rule 12(b)(6), the court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."  Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899 (9th Cir. 2007) (citation and quotation marks omitted).  Although the court may not consider a memorandum in opposition to a defendant's motion to dismiss to determine the propriety of a Rule 12(b)(6) motion, see Schneider v. Cal. Dep't of Corrections, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998), it may consider allegations raised in opposition papers in deciding whether to grant leave to amend.  See, e.g., Broam v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003).

III.    Plaintiff's Allegations

This action proceeds on plaintiff's original complaint.  (ECF No. 1.)  The only named defendant is California Board of Parole Hearings ("BPH") Commissioner Kevin Chappell.

Plaintiff alleges that on March 26, 2018, he filed a civil rights complaint alleging racial discrimination against white inmates by the BPH and defendant Chappell.  On February 21, 2019, plaintiff filed a first amended complaint in his civil rights action, again naming defendant

1 Chappell as a defendant.  On July 26, 2019 plaintiff filed a second amended complaint in his civil
2 rights action that did not name defendant Chappell as a defendant.

3 While defendant Chappell was a defendant in plaintiff's civil rights action, plaintiff served
4 defendant Chappell with special interrogatories and a request for production of documents.
5 Defendant Chappell responded to these discovery requests, acknowledging that he was a
6 defendant in this action.

7 On April 14, 2020, plaintiff appeared for a parole suitability hearing.  Defendant Chappell
8 was a commissioner at this hearing.  Plaintiff alleges that during this parole suitability hearing,
9 defendant Chappell referenced plaintiff's civil rights complaint.  Plaintiff alleges that defendant
10 Chappell "concealed from the public record" that he had been named as a defendant in this civil
11 rights action.  Plaintiff alleges that defendant Chappell chastised plaintiff for filing a civil rights
12 action.  Defendant Chappell allegedly told plaintiff to focus on himself and not Black inmates.

13 Plaintiff allege that at the April 14, 2020 parole suitability hearing, defendant Chappell
14 endorsed plaintiff as being psychotic and delusional.  Plaintiff alleges that his then-current mental
15 health diagnosis was "major depressive disorder, recurrent, severe, without psychotic features."
16 Plaintiff alleges that defendant Chappell prevented plaintiff from describing correct evidence
17 about his mental health diagnosis.

18 Plaintiff alleges that at the parole suitability hearing, plaintiff expressed his desire not to
19 discuss his civil rights complaint.  Plaintiff alleges that despite his protestations, defendant
20 Chappell insisted on discussing his civil rights complaint.

21 Plaintiff alleges that defendant Chappell prevented plaintiff from describing information
22 validating his claim of racism.

23 As a legal claim, plaintiff alleges that defendant Chappell retaliated against plaintiff for
24 filing a civil rights action against him by finding him unsuitable for parole.  As relief, plaintiff
25 requests that the court declare that defendant Chappell violated his constitutional rights.  Plaintiff
26 also seeks other "just relief" that the court deems necessary.

27 ////
28 ////

IV.    Discussion

    A.    Request for Judicial Notice

Defendant requests that the court take judicial notice of the transcript from plaintiff's April 14, 2020 parole suitability hearing. (ECF No. 18-1.) Defendant's request for the court to take judicial notice of the parole suitability hearing transcript is granted pursuant to Federal Rule of Evidence 201.

    B.    Immunity

Defendant moves to dismiss on the grounds that he is entitled to absolute immunity because he acted in a quasi-judicial role in deciding to deny plaintiff's parole.

BPH commissioners, who exercise quasi-judicial responsibilities in rendering parole decisions, are absolutely immune from damages liability in their official capacities. See Sellars v. Procunier, 641 F.2d 1295, 1302-03 (9th Cir. 1981); cf. Swift v. California, 384 F.3d 1184, 1186, 1191 (9th Cir. 2004) (parole officers not entitled to absolute immunity for conduct independent of Board's decision-making authority, e.g., performing investigatory or law enforcement functions).

Parole board officials are not entitled to absolute immunity for claims for injunctive or declaratory relief. In Tripp v. Bisbee, the Ninth Circuit reversed an order by the district court finding that defendant parole board members were entitled to absolute quasi-judicial immunity. 670 Fed.Appx. 494, 495 (9th Cir. 2016).

> However, while defendants are immune from suit for damages, because Tripp sought only injunctive and declaratory relief, defendants were not entitled to immunity. See Thornton v. Brown, 757 F.3d 834, 839 (9th Cir. 2013) (absolute immunity does not bar injunctive relief claim against parole unit supervisor); Buckwalter v. Nev. Bd. of Med. Exam'rs, 678 F.3d 737, 747 (9th Cir. 2012) ("Absolute immunity is not a bar to injunctive or declaratory relief.").

Id.

As observed by plaintiff in his opposition, plaintiff does not seek money damages. Plaintiff seeks declaratory relief and any other relief the court deems necessary. Accordingly, defendant's motion to dismiss on the grounds that he is immune from suit should be denied.

////

    C. <u>Retaliation</u>

*Legal Standard*

Prisoners have a First Amendment right to be free from retaliation. <u>Watison v. Carter</u>, 668 F.3d 1108, 1114–15 (9th Cir. 2012); <u>Brodheim v. Cry</u>, 584 F.3d 1262, 1269 (9th Cir. 2009). A retaliation claim has five elements. <u>Watison</u>, 668 F.3d at 1114. First, the plaintiff must show that the underlying conduct is protected. <u>Id.</u> The filing of an inmate grievance is protected conduct, <u>Rhodes v. Robinson</u>, 408 F.3d 559, 568 (9th Cir. 2005), as are the rights to speech and to petition the government, <u>Rizzo v. Dawson</u>, 778 F.2d 527, 532 (9th Cir. 1985).

Second, the plaintiff must show the defendant took adverse action against the plaintiff. <u>Rhodes</u>, 408 F.3d at 567. Third, the plaintiff must show a causal connection between the adverse action and the protected conduct. <u>Watison</u>, 668 F.3d at 1114. Fourth, the plaintiff must show that the "official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." <u>Rhodes</u>, 408 F.3d at 568. Fifth, the plaintiff must show "that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution ..." <u>Rizzo</u>, 778 F.2d at 532.

*Analysis*

Defendant moves to dismiss plaintiff's retaliation claim on the grounds that the alleged retaliation was not the but-for cause for plaintiff's parole denial. See <u>Hartman v. Moore</u>, 547 U.S. 250, 260 (2006) (the causal nexus requirement of a retaliation claim is a "but-for" causation test; if the adverse action would have been taken even without the inmate's exercise of protected conduct, the plaintiff cannot satisfy the causation element of the retaliation claim.) For the reasons stated herein, the undersigned recommends that defendant's motion to dismiss on these grounds be granted.

California Code of Regulations section 2281(b) states that "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole." Such information shall include,

> the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and

5

> other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Cal. Code of Regs., tit. 15, § 2281(b).

> Factors tending to show unsuitability include,
>
> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>
> (C) The victim was abused, defiled or mutilated during or after the offense.
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
>
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
>
> (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
>
> (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
>
> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Cal. Code of Regs. tit. 15, § 2281(c).

////

Factors tending to show suitability include,

>(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>
>(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
>
>(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.
>
>(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time.
>
>(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
>
>(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
>
>(7) Age. The prisoner's present age reduces the probability of recidivism.
>
>(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
>
>(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code of Regs. tit. 15, § 2281(d).

At the outset, the undersigned observes that the record in the instant case does not describe the crimes of which plaintiff was convicted. However, plaintiff filed a habeas corpus petition in the United States District for the Central District of California alleging that his continued incarceration violated the Eighth Amendment. See Adams v. Kernan, 2017 WL 6767382 (C.D. Cal. 2017). In the order denying plaintiff's habeas petition, the Central District described plaintiff's convictions. The Central District stated that in 1995, plaintiff was convicted of attempted first degree murder with enhancements for great bodily injury and the use of a firearm. 2017 WL 6767382, at *1. Plaintiff was sentenced to life with the possibility of parole

plus seven years.  (Id.)

At the April 14, 2020 parole suitability hearing, defendant Chappell described plaintiff's offense.[1]  On April 5, 1993, the thirteen year old victim, a friend and his stepfather were playing baseball.  (ECF No. 18-1 at 45.)  The ball rolled over and hit the tires of a vehicle that belonged to plaintiff.  (Id.)  Plaintiff became angry and took a swing at the victim's stepfather.  (Id.)  The victim hit plaintiff with the baseball bat.  (Id.)  After the incident, plaintiff threatened to kill the victim's family.  (Id.)  The next day, four tires on the stepfather's car were flattened.  (Id.)

On January 8, 1994, plaintiff bought a handgun and two boxes of ammunition.  (Id. at 46.)  On January 12, 1994, the victim and his friend were in the living room of the victim's residence.  (Id. at 47.)  When the doorbell rang, the friend answered the door and asked, "who is it?"  (Id.)  No one answered.  (Id.)  Plaintiff then opened the door from the outside, wearing rubber gloves, and pushed the friend toward the floor.  (Id.)  With his other hand, plaintiff fired at the victim, who was running toward the kitchen.  (Id.)  Plaintiff fired at the victim, hitting him in the back and shoulder area.  (Id.)  The victim sustained damage to his cervical spine, which caused quadriplegia from the chest down.  (Id.)

Plaintiff committed the offense when he was 21 years old.  (Id. at 14.)  At the time of the April 2020 parole suitability hearing, plaintiff was 47 years old and had been in prison for approximately 26 years.  (Id.)

During the suitability hearing, defendant Chappell initiated a fairly lengthy discussion with plaintiff regarding his civil rights complaint alleging racism by the BPH.[2]  (Id. at 34-42.)  The undersigned sets forth portions of this discussion herein.

Defendant Chappell began by asking plaintiff to clarify the racial issues plaintiff raised with Dr. Smith, who conducted the mental health evaluation for the Comprehensive Risk Assessment considered at the hearing.  (Id. at 34.)  Plaintiff told defendant Chappell that he (plaintiff) observed Black inmates with similar or worse records found suitable for parole.  (Id. at

---

[1]  Plaintiff does not dispute this description of his offense.

[2]  At the conclusion of this discussion, Deputy Commissioner Stanton also asked plaintiff about his claim that the BPH was racially biased.  (Id. at 42-44.)

34-35.) In response, defendant Chappell stated, "And what, and what I see, uh, Mr. Adams is, I, I believe you even took it a step further. I, I believe in 2019, um, you actually filed a complaint, correct?" (Id. at 35.)

Defendant Chappell went on to ask plaintiff, "And, and what I want to know is where did this come from? Cause I know in your complaint you mentioned just once and a doctor talks about one specific inmate and he compares that inmate to your case." (Id. at 36.) After plaintiff responded to this question, defendant Chappell again asked plaintiff, "I see. So, what was the purpose? What was the purpose of, of you filing that complaint? Um, I believe the board, um, received it. What was the purpose?" (Id.)

Defendant Chappell asked plaintiff if plaintiff thought the previous decisions finding him unsuitable for parole were racially driven. (Id. at 37.) Defendant Chappell went on to tell plaintiff that nowhere in the transcripts from his previous suitability hearing did he see anything that was racially driven. (Id. at 37-38.)

Later, defendant Chappell told plaintiff that, "just reading your complaint, and we won't get too far into this, but I'm just reading your complaint and you kind of alluded to it that, um, the individual or the inmate that you noted in your complaint actually had murdered someone. Right. And your complaint, it just leads one to think that, um, you felt the panel was being unjust because you didn't murder anyone." (Id. at 40.)

Plaintiff later left the hearing, waiving his appearance, after a discussion regarding his commitment offense. (Id. at 52.)

At the conclusion of the suitability hearing, defendant Chappell announced the decision finding plaintiff unsuitable for parole on the grounds that plaintiff posed an unreasonable risk to public safety. (Id. at 79.) Defendant Chappell first identified factors that mitigated plaintiff's risk including his lack of criminal history, his age that reduced the probability of recidivism, his diminished culpability as a youth and his growth and maturation in several areas while incarcerated. (Id. at 79-80.)

Defendant Chappell then identified the factors on which the panel found plaintiff unsuitable for parole. When discussing these factors, defendant Chappell discussed plaintiff's

civil rights action alleging racial bias in parole suitability hearings:

> You know, we had a discussion with Mr. Adams today before he decided to leave the hearing. Um, this discussion was about comments he made to Dr. Smith about, um, excuse me, that appeared to be delusional. Uh, and these comments referred to the board, uh, providing preferential treatment to one race of inmates over another. You know, it was obvious that when we ask these questions or attempted to ask these questions, uh, of Mr. Adams. It was obviously that he didn't want to discuss, uh, his claims with us. You know, however, this panel feels that, uh, there is something, uh, something within his, his personality or his mental illness that has led him to reached these conclusions that truly have no basis or as I mentioned earlier, appear to be delusional. And it's a concern for us because we know by what we see on a record that it was these delusional thoughts and or his mental illness is, is part of what has led him to violence in the past.

(Id. at 82-83.)

Defendant Chappell went on again to reference plaintiff's civil rights action during his announcement of the decision finding plaintiff unsuitable:

> His case is further complicated by chronic maladaptive personality traits as well as his history of mental illness. He has a tendency to become fixated on his perceived negative experiences as or slights against him. It was evidence that the current that is, excuse me, this fixation persists as he repeatedly spoke about the other inmates as predators with no insight into their crimes being released from prison. Further, his fixation on the other issue seems to distract from developing his own understanding regarding his personality structure of mental illness and potential for violent conduct.

(Id. at 84-85.)

Turning to plaintiff's retaliation claim raised in the instant action, the undersigned is troubled by defendant Chappell's questions to plaintiff regarding his civil rights action.[3] While it may have been appropriate to ask plaintiff about his racial bias claims, which plaintiff apparently raised with Dr. Smith, the undersigned finds that it was not appropriate for defendant Chappell to ask plaintiff direct questions specifically about his civil rights action that had named defendant Chappell as a defendant.

The undersigned is also troubled by defendant Chappell's finding that plaintiff was unsuitable for parole because his civil rights action demonstrated that plaintiff was delusional.

---

[3] It is not clear if plaintiff's civil rights action was still pending at the time of the parole suitability hearing.

10

While plaintiff's civil rights action may have been unmeritorious, the transcript from the parole suitability hearing contains no indication that Dr. Smith found plaintiff delusional based on this civil rights action. Moreover, it does not appear that defendant Chappell was qualified to render this diagnosis. The undersigned also disagrees with defendant Chappell's statement during his announcement of the decision that it was "obvious" that plaintiff did not want to discuss the claims raised in the civil rights action with him. The transcript indicates that plaintiff attempted to answer defendant Chappell's questions regarding his civil rights action and claims of racial bias.

However, even assuming defendant Chappell was motivated to retaliate against plaintiff for filing a civil rights action naming him as a defendant by finding plaintiff unsuitable for parole, the undersigned finds that this alleged retaliatory motive was not the "but for" cause of the BPH decision finding plaintiff unsuitable for parole on April 14, 2020. See Hartman v. Moore, 547 U.S. 250, 260 (2006) (the causal nexus requirement of a retaliation claim is a "but-for" causation test; if the adverse action would have been taken even without the inmate's exercise of protected conduct, the plaintiff cannot satisfy the causation element of the retaliation claim).

Defendant Chappell cited other, valid reasons in support of the decision finding plaintiff unsuitable for parole. For example, defendant Chappell found that plaintiff's Comprehensive Risk Assessment identified risk factors that remained relevant to plaintiff such as his understanding of his mental illness and/or personality issues, which had been linked to violence. (ECF No. 18-1 at 81.) See Cal. Code Regs. tit. 15, § 2281(c)(5) (lengthy history of mental illness related to offense tends to show unsuitability). The undersigned sets forth defendant Chappell's relevant discussion of the Comprehensive Risk Assessment herein.

During the hearing, defendant Chappell stated that the Comprehensive Risk Assessment contained a section prepared by a doctor, i.e., Dr. Smith, who found that plaintiff had "evidence currently relevant clinical factors associated with future violence." (ECF No. 18-1 at 52.) Defendant Chappell went on to read from the Comprehensive Risk Assessment prepared by Dr. Smith:

////

He does not have an adequate grasp of the personal, interpersonal, and contextual factors related to his past violent behavior or the factors that would mitigate or aggravate the likelihood of violent acts in in the future. While he is not completely devoid of insight in these areas, he needs to more meaningfully explore the causative factors related to his history of violent conduct and develop reasonable strategies to avoid such behavior in the future. His explanations of the cause that is the causative factors related to his crime were not very specific. In that time, it was difficult to ascertain exactly what he believed contributed to his behavior based on his general statements. The doctor goes on to state that further, Mr. Adams does not have an adequate understanding of his mental illness and precursors to psychiatric decompensation, which may help him more effectively manage his illness in the community. The doctor asked Mr. Adams to discuss his thought process and the seven months that elapsed between the confrontation with Kevin and his stepfather, and when he entered Kevin's home and shot Kevin, uh, Mr. Adams stated that at the time of the initial confrontation he was already suffering from emotional and mental health issues. Uh, it says he indicated that his state of mind continue to deteriorate. Uh, he stated that Kevin' family lives across the street. Mr. Adams informed that he was reached in the end of what he could take and continue, what he could and continue to deteriorate. Um, then ended up shooting Kevin. He denied repeatedly thinking about harming the victim over the seven month span. As said the doctor goes on to state when asked about seven months, what precipitated Mr. Adams shooting the victim on that particular day, he did not provide a direct answer and did not demonstrate any reasonable understanding of what triggered his behavior that day. He was asked to discuss his strategy to avoid violence in the community and he responded by stating he would boil his recovery down to two thoughts. Firstly, he noted appropriate boundary formation. He stated that in the past in the community he was either very passive or very violent. He informed that he allowed things to build up and would act out when he could not, could no longer suppress it. He reported that now he has appropriate boundaries and a voice which he, excuse me, which is how he avoids violence. He also stated that he is now accepting of being imperfect. The doctor notes that Mr. Adams had a limited understanding of the precursors for a psychiatric decompensation and had marginal understanding of specific symptoms. He acknowledged that he had triggers for his illness in the past and thinks that they may still be present at some level, but had difficulty providing any specifics. The doctor goes on to state that, um, with regard to what he's learned in his participation in self-help and mental health groups, says Mr. Adams stated that he learned it was okay to not be okay. He said being vulnerable is not as hard as it seems at first. He indicated that the only way out is to go through defects and that he learned that his perception of the world is not the only one. The other factors in the clinical domain that did not aggravate Mr. Adams risk for violence include that he has not expressed or demonstrated any violent intents in many years. He does not exhibit overt symptoms of major mental disorder and he has been fairly responsive to supervision and treatment in recent years as indicated by his lack of rules violations and participation in self-help.

(Id. at 52-55.)

Later in the hearing, defendant Chappell again discussed Dr. Smith's report prepared for the Comprehensive Risk Assessment: "However, he continues to lack insight with regard to violence and mental health issues and has made little improvement over the years with regard to his maladaptive personality traits. Overall, the doctor found him to be a moderate risk for violence." (Id. at 66.)

Plaintiff does not dispute that Dr. Smith made the findings described above by defendant Chappell. Accordingly, because defendant Chappell cited other valid reasons in support of the finding of unsuitability, the undersigned finds that defendant Chappell's alleged retaliation was not the "but for" cause of the April 14, 2020 decision finding plaintiff unsuitable for parole.

In his opposition to the motion to dismiss, plaintiff argues that defendant Chappell's other reasons for finding him unsuitable for parole were false and pretextual. See McCollum v. California Dept. of Corrections and Rehabilitation, 647 F.3d 870, 882 (9th Cir. 2011) (evidence of retaliatory motive can include evidence that reasons proffered by the defendant for the adverse action were false and pretextual). The undersigned discusses this argument herein.

Plaintiff argues that defendant Chappell improperly used the Comprehensive Risk Assessment to find him unsuitable. (ECF No. 22 at 26-27.) In support of this argument, plaintiff cites Scott v. Marshall, 2010 WL 3928942 (C.D. Cal. Sept. 15, 2010).[4] (Id. at 26.)

In Scott v. Marshall, the petitioner challenged the Governor's decision reversing the BPH's finding of suitability for parole.[5] 2010 WL 3928942, at *1. In his decision, the Governor cited the petitioner's three most recent mental-health evaluations, noting that the evaluators considered him a "moderate" risk for perpetrating future violence in the community. (Id.) The district court found that a "[c]loser review of the 2006 mental health evaluation reveals that the 'moderate' risk finding in the petitioner's case has no predicative value with respect to current

---

[4] Plaintiff incorrectly identifies Scott v. Marshall as a Ninth Circuit case.

[5] Scott v. Marshall was decided before the Supreme Court decided Swarthout v. Cooke, 562 U.S. 216 (2011). In Swarthout, the Supreme Court rejected the contention that the federal Due Process Clause contains a guarantee of evidentiary sufficiency with respect to a parole determination. Swarthout, 562 U.S. at 220-22.

13

1  dangerousness." (Id., at *9.) In relevant part, the 2006 report stated,

> A review of Dr. Livingston's raw dates does indicate that Mr. Scott scored within the low range on dynamic factors. Dynamic factors tend to reflect current functioning. Further, regardless of the positive programming Mr. Scott engages in while incarcerated, his score will never be lower than moderate range on these instruments based on his history. Thus, the risk for recidivism on a violent crime while in the free community remains within the moderate range.

(Id.)

The district court found that the petitioner's "psychological report cannot constitute 'some evidence' of his current dangerousness, because by definition, it does not reflect his 'current functioning.' Nor can it ever change." (Id.)

In Scott v. Marshall, the district court held that the recidivism risk prediction in the 2006 mental health evaluation made in that particular case did not reflect the petitioner's current functioning because his risk score would always be moderate based on his history, even though the petitioner scored within the low range on dynamic factors.

In the instant case, as discussed above, the doctor who prepared plaintiff's Comprehensive Risk Assessment (Dr. Smith) found plaintiff to be a moderate risk based on his current mental health status. For example, Dr. Smith found that plaintiff did not have an "adequate grasp of the personal, interpersonal, and contextual factors related to his past violent behavior or the facts that would mitigate or aggravate the likelihood of violent acts in the future." (ECF No. 18-1 at 52-53.) Dr. Smith also found that plaintiff "needs to more meaningfully explore the causative factors related to his history of violent conduct and develop reasonable strategies to avoid such behavior in the future." (Id. at 53.) As stated above, plaintiff does not dispute that Dr. Smith made these findings.

Unlike the Comprehensive Risk Assessment discussed in Scott v. Marshall, plaintiff's Comprehensive Risk Assessment reflected his current functioning. Therefore, defendant Chappell properly considered the Comprehensive Risk Assessment in finding plaintiff unsuitable for parole.

Citing In re Palermo, 171 Cal.App.4th 1096 (2009), disapproved on other grounds in In re Prather, 50 Cal.4th 238 (2010), plaintiff next argues that defendant Chappell improperly found

14

him unsuitable for parole on the grounds that he lacked insight. (ECF No. 22 at 28-29.) In Palermo, the court found that discrepancies between the evidence and the defendant's version of events did not indicate a lack of insight because the defendant's description of events was not physically impossible and did not strain credulity since his version was not "delusional, dishonest or irrational." 171 Cal. App.4th at 1112.

In the instant case, defendant Chappell stated, in relevant part,

> Uh, and these comments referred to the board, uh, providing preferential treatment to one race of inmates over another. You know, it was obvious that when we ask these questions, uh, of Mr. Adams. It was obviously that he didn't want to discuss, uh, his claims with us. You know, however, this panel feels that, uh, there is something, uh, something within his, personality or his mental illness that has led him to reached these conclusions that truly have no basis or as I mentioned earlier, appear to be delusional. *And it's a concern for us because we know by what we see on a record that it was these delusional thought and or his mental illness is, is part of what had led him to violence in the past. So, we still see a lack of insight into addressing these areas of his mental illness, um, addressing areas of, um, possible violent ideations.*

(ECF No. 18-1 at 82-83 (emphasis added).)

While defendant Chappell improperly found that plaintiff lacked insight based on plaintiff's alleged delusional thoughts, apparently in reference to plaintiff's civil rights action, defendant Chappell also found plaintiff unsuitable based on plaintiff's lack of insight into his mental illness as it related to his violent past.

As discussed above, defendant Chappell quoted from Dr. Smith's report in the Comprehensive Risk Assessment, which stated that plaintiff did not have "adequate grasp of the personal, interpersonal and contextual factors related to his past violent behavior or the factors that would mitigate or aggravate the likelihood of violent acts in the future." (ECF No. 18-1 at 52-53.) Dr. Smith went on to state that, "While he is not completely devoid of insight in these areas, he needs to more meaningfully explore the causative factors related his history of violent conduct and develop reasonable strategies to avoid such behavior in the future." (Id. at 53.) Dr. Smith also stated, "His explanations of the cause that is the causative factors related to his crime were not very specific. In that time, it was difficult to ascertain exactly what he believed contributed to his behavior based on his general statements." (Id.)

While plaintiff's version of the facts regarding his offense may have been consistent with the official version of the facts, Dr. Smith's report suggests that plaintiff's current mental illness contributed to his lack of understanding regarding why he committed his life crime. For this reason, the undersigned finds that defendant Chappell did not improperly find plaintiff unsuitable for parole on the grounds that he lacked insight. See In re Renteria, 2012 WL 603793, at *9 (Cal.App. Feb. 24, 2012) (citing In re Shaputis, 44 Cal.4th 1241 (Cal. 2008) ("As Shaputis I illustrates, a 'lack of insight' into past criminal conduct can reflect an inability to recognize the circumstances that led to the commitment offense; and such an inability can imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way.").

Plaintiff also suggests that defendant Chappell wrongly characterized his mental illness diagnosis and refused to allow him to correct information in the record regarding his mental illness in order find plaintiff unsuitable for parole based on his mental illness. (ECF No. 22 at 29-31.) Plaintiff argues that during the hearing, defendant Chappell identified plaintiff's mental illness as including psychosis, post-traumatic stress disorder, personality issues, chronic maladaptive personality traits such as paranoid personality disorder, schizoaffective disorder and avoidant personality disorder. (Id. at 29-30.) Plaintiff argues that defendant refused to allow plaintiff to provide correct information regarding his mental illness. (Id. at 30.) Plaintiff argues that his current mental health diagnosis was major depressive disorder, recurrent severe, without psychotic features. (Id.) Plaintiff argues that he had no personality disorders.[6] (Id.)

The undersigned has reviewed the section of the transcript from the suitability hearing where defendant Chappell discussed plaintiff's history of mental illness. It appears that when

---

[6] In support of his claims regarding his current mental illness diagnosis, plaintiff cites a Mental Health Progress Note dated September 12, 2019 attached to his opposition. (ECF No. 22 at 157-59.) In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court only considers the "four corners of the complaint without consideration of other documents or facts outside the complaint." Wolcott v. Meuller, 2013 WL 6795412, at *3 (S.D. Cal. Dec. 20, 2013). For this reason, the undersigned does not consider the Health Progress Note attached to plaintiff's opposition. However, the undersigned observes that this report describes plaintiff's ongoing medical history to include major depressive disorder, recurrent, severe without psychotic features. (ECF No. 22 at 157.)

defendant Chappell stated that plaintiff had psychosis, post-traumatic stress disorder, etc., he was describing the diagnosis given to plaintiff by Dr. Emerick, the doctor who apparently prepared a report regarding plaintiff's competency for trial. (See 18-1 at 29-30.) The undersigned has also reviewed the pages of the transcript cited by plaintiff as evidence of defendant Chappell's refusal to allow him to correct information regarding his mental health, i.e., pages 25:13-21 and 27:10-14. (See ECF No. 22 at 30.) The undersigned does not find that defendant Chappell refused to allow plaintiff to present evidence regarding his current mental health diagnosis. (See ECF No. 18-1 at 29:13-21, 31:10-14.)

More importantly, as discussed above, defendant Chappell discussed Dr. Smith's report contained in the Comprehensive Risk Assessment, which addressed plaintiff's current mental health. Defendant Chappell noted that Dr. Smith found that plaintiff "does not exhibit overt symptoms of major mental disorder and he has been fairly responsive to supervision and treatment in recent years as indicated by his lack of rules violations and participation in self-help." (ECF No. 18-1 at 55.) Plaintiff's claim that defendant Chappell intentionally mischaracterized his mental health diagnosis and/or status in order to find him unsuitable for parole is not supported by the record.

Plaintiff next argues that defendant Chappell improperly found him unsuitable based on plaintiff's failure to discuss his life crime. (ECF No. 22 at 27.) California Code of Regulations, tit. 15, § 2236 provides,

> The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability. The board shall not require an admission of guilt to any crime for which the prisoner was committed. A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against a prisoner.

When defendant Chappell asked plaintiff about the facts of his life crime, plaintiff told him, "Um, I'm going to submit to the record on that." (ECF No. 18-1 at 45.) When defendant Chappell continued to question plaintiff about the facts of his life crime, plaintiff again stated, "I'm going to rely on my previous statements." (Id. at 46.) Defendant Chappell continued to ask plaintiff questions about the facts leading up to the life crime including if plaintiff purchased two

boxes of ammunition and why he bought a handgun. (Id. at 46.) In response, plaintiff told defendant Chappell, "I've discussed that at length, sir, in my previous hearings. It's not going to give me any good to, uh, --" (Id.) Plaintiff went on to state that he wanted to rely on the statements he made at the previous hearing regarding the facts of his life crime but he wanted to discuss the finding by two commissioners from his previous suitability hearings found that he was lying about his possession of latex gloves and handcuffs. (Id. at 48-51.) Shortly after this discussion, plaintiff left the hearing. (Id. at 52.)

In the decision, defendant Chappell stated, in relevant part,

> Uh, he wasn't forthcoming with information at times. He wanted to control of the conversation and wanted to deflect and not answer questions by stating that he either stipulates to the record, referring to previous comments or, or he wanted to stand on information that he's submitted to the board.

(Id. at 82.)

It appears from the comments quoted above that defendant Chappell may have improperly considered plaintiff's refusal to answer questions about the facts of his life crime to find plaintiff unsuitable for parole.

In conclusion, the undersigned finds that assuming defendant Chappell was motivated to retaliate against plaintiff for filing a civil rights action naming him as a defendant by finding him unsuitable for parole, as evidenced by defendant Chappell's improper reliance on plaintiff's civil rights action and plaintiff's refusal to discuss the facts of the life crime, defendant Chappell's alleged retaliation was not the "but for" cause of the decision finding plaintiff unsuitable for parole. As discussed above, defendant Chappell's decision finding plaintiff unsuitable was supported by valid reasons, including the information contained in the Comprehensive Risk Assessment, which found that plaintiff posed a moderate risk for violence. For these reasons, defendant's motion to dismiss should be granted.[7]

////

---

[7] Based on the views expressed by defendant Chappell in his comments and questions regarding plaintiff's civil rights action, in which he was named as a defendant, defendant Chappell may consider recusing himself from plaintiff's future parole suitability hearings.

1       Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court shall appoint a district judge to this action;

        IT IS HEREBY RECOMMENDED that defendant's motion to dismiss (ECF No. 18) be granted.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  November 6, 2020

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Adams844.mtd